WHIPPLE, Judge.
This case is before us on appeal from a judgment terminating the parental rights of BS (the father) and'TS (the mother). The mother appeals.
FACTS AND PROCEDURAL HISTORY
BS and TS are the natural parents of the minor children: WS, a boy born on June 27, 1982; JS, a boy bom on July 7, 1984; and, HS, a girl born on April 11, 1988.
On February 16, 1990, an instanter order was issued, and the minor children, WS, JS, and HS, were placed in the custody of the State of Louisiana, Department of Health and Human Resources, Office of Human Development (State). Following a “72-hour hearing” on February 20, 1990, the minor children were adjudged “children in need of care” and custody of the children was continued with the State upon stipulation of the parties.[1]
The record in this case includes transcripts of seven separate hearings relative to these children after the initial “72-hour hearing”: an adjudication and disposition hearing held on May 29,1990; a six-month review hearing held on July 26,1990; a twelve-month review hearing held on January 24, 1991; an eighteen-month review hearing held on July 23, 1991; a dispositional review hearing held on January 24, 1992; a dispositional review hearing held on July 6, 1992; and the termination proceedings held on December 11, 1992.
From these hearings, we have gleaned the following facts. This family was well known to the State prior to the February 20, 1990, hearing when custody of these three children was awarded to the State. In 1980, the parents’ first born child had been removed *410 from their custody due to neglect and was ultimately adopted by a relative.
In December of 1987, the State began working with the family with regard to the three children involved in this appeal after receiving complaints of abuse and neglect, including physical abuse of the children by the father. Donna Cohen, a Case Investigator for the Office of Community Services, was the initial case investigator. Her investigation revealed that the children lived with their parents and paternal grandmother in a filthy mobile home in which there was exposed food, unsanitary living conditions, and roach infestation. Cohen observed that the two boys were neglected and developmental-1y delayed and were not attending school or receiving normal environmental stimuli.
In February of 1988, Roseanne Brodie, a Social Service Specialist II with the Office of Community Services, was assigned as the family service worker for the family. Upon investigation, Brodie discovered that WS, then age five, and JS, then age three, were still wearing diapers and drinking from bottles. According to Brodie, the investigation revealed that the two children were “talking very little, if at all” and that JS was “only grunting.” She discovered that the children were being locked inside the trailer most of the time and noted that the conditions of the family’s mobile home were substandard, as the inside of the trailer was filthy. Further, WS and JS had extremely poor dental health, which Brodie described as “a mouthful of rotten teeth.” Brodie also received continued reports from sources in the community of on-going physical abuse of the children by their father, including reports of the father “slapping” them, “knocking around” WS, and inflicting a black eye on the child.
Brodie conducted a “family team conference” in February of 1988, and the parents were asked to improve their parenting skills by attending parenting classes. Their cooperation in seeking dental care for the children was also requested. Brodie scheduled several dental appointments for the children, which the parents failed or refused to attend. Mr. and Mrs. S told Brodie they missed the first appointment due to lack of gasoline, despite the fact that state-provided transportation was available to them. The remaining appointments were missed because the parents refused to take the children to the dentist, BS explaining that WS was going to get new teeth anyway and that JS was afraid. Finally, nine months later, and after the State had obtained an order adjudging the family “in need of supervision,” the children received medical attention and were hospitalized for oral surgery at Children’s Hospital.
At the “family team conference,” the parents were also asked to cooperate with the school system in enrolling the children in school. Brodie explained that it required approximately seven months, from February to September of 1988, to accomplish enrollment of the children, despite the fact that the children could have been registered immediately. This delay was attributed to the parents’ failure to keep appointments with the school system to have the children evaluated.
In 1989, Brodie received further complaints of physical abuse of WS by the father. Also, by this time, the third child, HS, was born, and there were complaints that the father was physically abusing the baby.
Nonetheless, the State continued in its efforts to work with the family in February of 1990, when an instanter order was issued, removing the children from the custody of the parents and placing them in the custody of the State. The incident prompting the children’s removal from the home was the father’s alleged stabbing of WS in the chest with a steak knife or pocket-knife and the parents’ subsequent failure to seek medical attention for the boy’s injury.
William H. Smith, a Social Service Specialist I, investigated this incident on February 12, 1990, after receiving a report from school authorities that WS had been cut by his father during an incident at home over the weekend for which no medical attention had been sought by the family.
Smith went to WS’s school and interviewed the child regarding the cut. WS told the social worker that he had been in an argument with his father and that he had slapped his father. After his father slapped him back, his father went into another room, came back with a pocket-knife and cut him. *411 Smith then went to the family home and interviewed the parents separately. The father initially claimed that he was eating potted meat with a butter knife and accidentally inflicted the chest wound. However, at the hearing held on January 24, 1992, Mr. S denied any incident involving WS being cut with a knife and stated that he had no knowledge of any injury until he was notified of such by the school.
Smith also interviewed the mother concerning the wound, and she explained that her husband had been drinking and had engaged in an argument with WS. According to Smith, the mother’s initial version of what had occurred corroborated the child’s explanation. However, at the termination hearing, the mother instead claimed that WS had been cut while playing outside in the chicken yard and denied any incident involving the father.
Dr. Nancy Mule, an expert in the field of pediatrics, examined WS on February 14, 1990. At the time, the chest wound was four days old, and she described it as being three inches long, three centimeters wide, of some depth with penetration of the superficial layers and gaping margins. By the time Dr. Mule examined the child, granulation tissue was forming, and the wound was showing signs of infection. Dr. Mule opined that WS had not received adequate medical care as the wound had not been sutured. Finally, Dr. Mule opined that the appearance of the chest wound was consistent with the history obtained from the child.
Following this incident, the case workers concluded that the children were at risk. In response to the stabbing incident involving the oldest child and the prior validated complaints of abuse and neglect of all three children, the children were removed from their parents’ custody by instanter order on February 16, 1990, and placed in separate foster homes. Shortly after the removal of the children from the family home, WS disclosed to Smith that he had been sexually abused by his paternal grandmother, ES, who lived in the mobile home with the parents and children prior to their removal and with whom WS had shared a bed prior to removal from the family trailer. WS was seen by a psychologist, Dr. William Bradford Janzen, who opined that the child’s complaints of sexual abuse were valid.
After prolonged attempts to reunify the family failed, the State’s stated goal of reunification was eventually changed to a goal of termination of parental rights for eventual adoption, with respect to the mother’s rights at the eighteen-month review hearing on July 23,1991. However, the State was ordered to continue working with the father towards the goal of reunification. At the next review hearing held on January 24, 1992, the case goal with respect to the father was also changed to termination of parental rights. Thereafter, on May 28,1992, the State filed a petition for termination of parental rights, pursuant to Louisiana Children’s Code article 1015, sections (4), (5), and (7). A hearing on the petition was conducted on December 12, 1992. Following the hearing, the trial court rendered judgment terminating the parental rights of both parents and freeing the children for adoption.
From this judgment, the mother, TS, appeals.[2] The following is designated as error:
1. The trial court erred in failing to appoint separate counsel for TS when she separated from her husband, the father of the children, in view of her mental retardation, and the divergent positions and interests of the two parents.
2. The trial court erred in appointing the attorneys of the Indigent Defender’s Office to represent the children when this office initially represented both parents.
3. The trial court erred in terminating the parental rights of TS when there had been little effort to reunite this mother with her children because of her retardation and lack of cooperation, resulting in the State not considering her position separately from that of the father, even though she separated from him shortly *412 after the children were taken into State custody.
For the following reasons, we find no merit in the errors assigned by the appellant herein and accordingly, affirm the judgment of the trial court terminating the parental rights of the mother.
ASSIGNMENTS OF ERROR NUMBERS ONE AND TWO
In these related assignments of error, TS contends that her due process rights were violated because the trial court faded to appoint separate counsel for her when she separated from her husband. She argues on appeal that her mental retardation prevented her from giving informed consent to the various attorneys who represented her and contends they were representing an interest, ie. her husband’s interest, which conflicted with her own. She further claims that the trial court violated her due process rights in these proceedings by appointing an attorney with the Indigent Defender’s Office to represent the children when the office initially represented both parents. We find no merit in these claims.
As the record shows, commencing with the adjudication hearing initially scheduled for April 27, 1990, continuing through the adjudication hearing on May 29, 1990, and the six-month review hearing held on July 26, 1990, Mr. and Mrs. S appeared and were represented by their retained counsel, Thomas Ford. The record also shows that some time after the July 16, 1990, hearing and prior to the twelve-month review hearing on January 24, 1991, the parents discharged Mr. Ford. As the record further reflects, although the parents were instructed to contact the Indigent Defender’s Office, they instead chose to appear without counsel and faded to request counsel until the morning of the hearing. While the hearing was conducted as scheduled (and without counsel), the record shows that the interests of the State and the parents at that time were identical: namely, reunification of the family.
Moreover, once the court determined that the stated goal should change from reunification to termination, Mr. and Mrs. S were both afforded legal counsel.
At the next hearing, after the stated goal had changed, the parents again appeared without counsel. Prior to commencing the hearing, the court appointed Mr. A.J. Hand to represent the parents. The record shows that Hand fully participated in the hearing, including direct and cross-examination of the witnesses, and thereafter continued to represent the parents at the subsequent hearings on January 24, 1992, and July 6, 1992.
After the filing of the petition for termination of parental rights, the trial court conducted an indigency hearing and appointed separate counsel to represent each of the parents at the termination hearing held four months later on December 11, 1992.
Due process requires notice of proceedings and a fair opportunity to defend or present objections. Grimmer v. Beaud, 537 So.2d 299, 302 (La.App. 1st Cir.1988), writ denied, 538 So.2d 613 (La.1989). Considering the above, we are unable to conclude that appellant was denied representation at any stage of these proceedings. As the record shows, the lower court carefully protected the interests of the parents, both individually and as a couple. Indeed, once the petition for termination was filed, Mrs. S was appointed separate counsel, including appellate counsel.
As part of an attorney’s duty to his client, he may not represent different interests which are hostile to or in conflict with one another. Louisiana Bank & Trust Company v. Anderson, 526 So.2d 1386, 1389 (La. App. 3rd Cir.1988). In this case, we cannot conclude that the parents had hostile or conflicting interests during the time they were jointly represented by counsel. Although the goal stated in the case plan changed from reunification to termination in reference to the mother prior to the change in stated goal in reference to the father, this did not necessarily create a conflict in the parties’ interests. It was not necessary that the mother’s interests be sacrificed so that the father could prevail. We believe the attorney they shared as counsel could, and did, appropriately champion the common interest of both *413 parents: namely, reunification with their children.
Moreover, as counsel for the children correctly notes in his brief to this court, the issue on appeal is whether the parental rights of Mrs. S were properly terminated in the termination proceedings. It is clear from the record that Mrs. S was vigorously represented at the termination hearing and in this appeal by separate and independent counsel.
Additionally, we find no merit in appellant’s contention that the trial court erred in appointing the indigent defender’s office to represent the children when that office had initially represented the parents at the 72-hour hearing.
The record shows that the indigent defender’s office represented the parents at only one hearing, the initial 72-hour hearing. At that very brief hearing, the parents did not contest the State’s award of custody, and in fact stipulated to State custody. Considering the brief nature of the hearing and the stipulation by the parties, we find no merit in appellant’s claim that her due process rights were violated.
We have reviewed the record herein and conclude that both parents were adequately represented by counsel throughout the entirety of these proceedings and were afforded due process. Consequently, these assignments of error are without merit.
ASSIGNMENT OF ERROR NUMBER THREE
In her final assignment of error, appellant contends that the trial court failed to consider her position separately from the father’s and erred in terminating her parental rights under the facts of this ease.
The State’s petition for termination of parental rights was filed pursuant to LSA-Ch.C. art. 1015(4), (5), and (7). These provisions of the Children’s Code, effective January 1, 1992, are substantially similar to the provisions previously found in now-repealed LSA-R.S. 13:1601(B), (D), and (F). Thus, we adhere to jurisprudence interpreting the former legislation. See State in the Interest of V.T., A.T, H.T., and T.T., 609 So.2d 1105, 1107 (La.App. 2nd Cir.1992), writ denied, 614 So.2d 1269 (La.1993).
LSA-Ch.C. art. 1015 provides several subsections containing the requirements for the termination of parental rights. The State’s petition for termination of parental rights alleges grounds for termination pursuant to subsections (4), (5), and (7). The judgment rendered by the trial court does not specify which of the subsections were relied upon, stating only that “all parental rights and obligations of [BS] and [TS] relative to the minor children ... be and are totally and irrevocably terminated and dissolved pursuant to the provisions of La.Ch.C. Art. 1001 et seq.”
The State need only prove the grounds for termination under one subsection. V.T., 609 So.2d at 1107. Having found that all of the elements of subsection (5) are satisfied under the facts of this case, we pretermit discussion of the other subsections relied upon by the State in its petition.
LSA-Ch.C. art. 1015 sets forth the grounds for involuntary termination of parental rights and provides, in part, as follows:
The grounds set forth in the petition must meet all of the conditions of any one of the following Paragraphs:
******
(5)Prior adjudication as a child in need of care and removal from the parental home
(a) One year has elapsed since a child was removed from the parent’s custody pursuant to a court order in a child in need of care proceeding and placed either in the custody of an agency or individual.
(b) The parent is now unfit to retain parental control, and there is no reasonable expectation of his reformation in the foreseeable future.
(c) The department has made every reasonable effort to reunite the child with his parents to no avail but now recommends that reunification would not be in the best interests of the child.
LSA-Ch.C. art. 1035 dictates that the elements of subsection (5) of article 1015 must be proven by clear and convincing evi- *414 denee. Also, the factual findings of the trial court in determining whether the requirements of a subsection have been satisfied will not be set aside in the absence of manifest error. V.T., 609 So.2d at 1107. Applying these principles to this case, we conclude that the record amply supports the trial court’s judgment terminating the parental rights of TS. The evidence clearly and convincingly shows that the children involved in this appeal had been removed from their mother’s custody in excess of one year prior to the filing of the State’s petition to terminate her parental rights due to neglect. Moreover, the record of this case overwhelmingly shows: (1) that the mother’s mental deficiencies made her unable or unwilling to provide an adequate home now or in the foreseeable future; (2) that the department made every reasonable effort to reunite the mother and children to no avail; and (3) that reunification was clearly contrary to the best interests of the children.
The children were removed from their parents’ custody pursuant to an instanter order dated February 16, 1990. On February 20, 1990, the court rendered the judgment adjudicating the children in need of care and finding that the minor children were in need of care, abused or neglected. Legal custody of the children was assigned to the Department of Health and Human Resources, Office of Community Services. The petition for termination of parental rights was filed on May 28, 1992. Consequently, more than one year had elapsed between the removal of the children from their parents’ custody pursuant to a court order in a child in need of care proceeding and the filing of the petition for termination of parental rights.
The second requirement of subsection (5) of LSA-Ch.C. art. 1015 is that the State prove that the parent is unfit to retain parental control, and that there is no reasonable expectation of reformation in the foreseeable future.[3]
Here, we find overwhelming evidence in the record to support the trial court’s conclusion that TS was an unfit parent. The documentary evidence and the testimony elicited in these proceedings illustrate the severe deterioration of the physical and mental condition of the children caused by the mother’s neglect and abuse. The deleterious effect of her parental influence is shown in the testimony and records documenting the modalities of treatment required after the State obtained custody.
On July 26, 1990, at the six-month review hearing, Lynn Folse, of the Office of Community Services, detailed the status of the children. When custody was first obtained by the State, the children could not be placed together but were required to be placed in separate foster homes due to the special needs of each child.
HS, the youngest child, was placed in foster care and enrolled in the STARK home-based day care program for developmentally delayed children. She was in need of speech therapy and medical care. JS was also placed in foster care and was seen by a pediatric ophthalmologist because of his need for glasses.
WS, the oldest child, suffered the greatest mental deterioration due to the living conditions to which he had been exposed. WS was evaluated by Dr. Thomas C. Roach, a psychologist, on May 3, 1990, shortly after being placed in foster care. Dr. Roach noted *415 the extreme difficulties WS was experiencing. Dr. Roach interviewed the child’s foster mother who relayed that WS exhibited violent behavior involving hitting and punching other children in the foster home, as well as severe behavioral problems at school occasioned by his aggressive behavior. School officials were concerned with the child’s continuing violent and aggressive behavior and considered expulsion after he broke another child’s arm and knocked out another child’s front tooth. Dr. Roach also noted that WS exhibited continuing severe encopresis which presented a serious problem, as WS would deliberately have huge bowel movements in his pants and smear the feces over his body and the walls. Following Dr. Roach’s evaluation, he recommended inpatient hospitalization in the children’s unit at Southwest Louisiana Hospital, a psychiatric facility. WS was hospitalized on May 15, 1990.
As of January 24, 1991, the date of the twelve-month review hearing, WS was still hospitalized. JS was still placed in foster care but had recently transferred from a regular special education kindergarten to a non-categorical pre-school. At this point, when JS was six and a half years old, he had finally been toilet trained successfully by his foster parents. HS was in foster care and while apparently adjusting well, exhibited speech problems and developmental delays.
At the July 23, 1991, hearing, the State informed the court that WS had recently been discharged from Southeast Hospital, after a diagnosis of post-traumatic stress disorder and specific developmental disorders. WS was placed on medication for his behavioral and emotional condition, and was referred to an outpatient mental health center for continued treatment.
JS continued in foster care but was prone to temper tantrums and head banging incidents. JS had been referred to Dr. Clifford G. Crafton for psychiatric evaluation. Dr. Crafton recommended therapy for both the foster mother and JS to set up a behavior modification program. HS was in her second foster home and not having any major behavioral problems.
As of January 24, 1992, WS had been rehospitalized because the foster family was unable to provide the structured setting his mental condition required. The hospital staff and treatment team at Southwest Louisiana Hospital recommended placement in a residential facility, and WS was thereafter placed at the Bethlehem Children’s Home in New Orleans.
As of July 6, 1992, the last review hearing prior to the termination proceedings, HS and JS remained in foster care. HS’s foster parents expressed an interest in adopting her. JS’s placement was uncertain due to his severe emotional problems. WS still resided at the Bethlehem Children’s Home, continuing to display inappropriate behavior, such as feces smearing and sexual acting out. While HS and JS had received some parental visitation, WS had not visited his parents in over a year upon the recommendation of his physicians.
As the record painfully and tragically demonstrates, these children suffered severe abuse and neglect. The total absence of care or nurturing by their parents resulted in the severe physical and emotional deterioration of these children.
Following the removal of the children from TS’s custody, the mother was evaluated by several psychologists in connection with these proceedings. The experts agree that Mrs. S suffers from mental retardation and functions at the level of a six to eight year old. The experts also agreed that she could not benefit from classes, services, or counseling due to her retardation.
Dr. Brian Murphy, a psychologist, testified at the termination hearing, and his formal report addressing appellant’s lack of parenting skills was made a part of the record herein. Dr. Murphy stated:
Perhaps what is most interesting and indeed very disturbing to the examiner is that this is a woman who does not appreciate in any respect the reasons for having a Protective Service Agency, that being to look after the well-being of children who can’t defend themselves. Again, this lack of insight is very troubling.
Wondering about the patient’s parenting style ... suffice it to say that this is a person who certainly does not employ *416 proper child rearing policies. She is disposed to be rather punitive and certainly not one who would nurture her children. I also have concerns as to the patient’s competency insofar as dealing with everyday problems would be concerned as would impact in raising minor children.
Dr. Murphy concluded that appellant could not benefit from parent effectiveness training, both as a consequence of her limited intellect and because of her lack of motivation, and opined that the family showed very poor prognosis for making any sort of meaningful change.
After conducting extensive psychological testing and evaluation of the children’s parents and grandmother, Dr. Murphy concluded:
[B]ecause of a lack of insight and indeed because the patients do not even admit to any semblance of a problem, we are not likely to make any significant impact insofar as counseling and/or psychotherapy would be concerned- [H]owever, ... the children might benefit from a referral to the local mental health center or some other such agency for treatment, if only for the purpose of assuring them and providing nurturance and support. Indeed, we can assume that all of the children have been significantly traumatized and will need help in working through and resolving problems in consideration of such.
In reference to reasonable expectations of reformation in the foreseeable future, all experts agreed that the possibility of reformation was virtually non-existent with respect to the mother in light of her strenuous denial of any wrong-doing and refusal to seek treatment and assistance.
Considering the record herein, we cannot conclude that the trial court erred in finding that TS was an unfit parent and that she was unable or unwilling to provide an adequate, permanent home for the children at present or in the reasonably near future.
The final requirement which the State must prove under LSA-Ch.C. art. 1015(5) is that the department has made every reasonable effort to reunite the children with the parents without avail and that reunification would not be in the best interests of the children.
The record clearly shows that the State offered various services to the family, including TS, in an attempt to reunify the family. However, TS refused to attend parenting classes or sexual abuse workshops offered by the State. While it is clear that at the time of the termination proceedings, TS had moved out of the mobile home and was living with her mother, she nonetheless continued to reject services offered by the State and steadfastly refused to accept responsibility for the harm her children had suffered. As the record shows, she continues to deny that her children suffered any neglect or abuse while in her care.
Mela Khedouri, employed by Family Services of Greater New Orleans, and qualified as an expert Board Certified Social Worker, testified at the termination hearing that she had counseled the father and grandmother for two years without improvement. Khe-douri testified that TS was also offered counseling, but she refused. Khedouri stated that TS was resistant to any sort of help because she denied that any wrong-doing or neglect had occurred. Khedouri testified that neither parent was capable of caring for the children and that the children needed better care than either parent was able to provide. Dr. Murphy also concluded that TS was not capable of caring for the children because she was not agreeable to intervention.
Roseanne Brodie, the family case manager, also testified at the termination hearing concerning TS’s consistent refusal of assistance offered by the State. Brodie testified that when TS moved from the mobile home, she initially refused to give the agency her new address or phone number. Brodie stated that she finally was able to visit TS at her subsequent home on one occasion, but that she still refused to acknowledge that any wrong-doing had occurred. Brodie also concluded that it was in the children’s best interest that TS’s parental rights be terminated.
Considering the above and foregoing, we find that the State overwhelming established by clear and convincing evidence the ele *417 ments contained in LSA-Ch.C. art. 1015(5), and accordingly, that the trial court properly terminated the parental rights of TS.
CONCLUSION
For the above and foregoing reasons, we find no merit in the assignments of error specified by appellant herein. Accordingly, the judgment of the trial court terminating the parental rights of TS is hereby affirmed.
AFFIRMED.

. The parents stipulated to continued custody with the State with the understanding that a home study would be conducted with a plan for prompt placement of the children with relatives.

. The appeal herein is filed on behalf of TS only. The father, BS, did not file an appeal; therefore, the judgment terminating his parental rights is now final. TS alleges in her brief to this court that the father died of natural causes; however, there is nothing in the record to confirm or deny his death.

. LSA-Ch.C. art. 1003(10) provides:
(10) "Unfit” refers to any of the following behaviors or conditions of a parent:
(a) Who has abused a child by inflicting physical or mental injury which causes severe deterioration to the child, or who has sexually abused, exploited, or overworked a child to such an extent that his or her health or moral or emotion well-being is endangered.
(b) Who has consistently refused to provide reasonably necessary food, clothing, appropriate shelter, or treatment either by medical care or other health services in accordance with the tenets of a well-recognized religious method of healing with a reasonable proven record of success. Financial inability alone shall not constitute grounds for termination of parental rights.
(c)Whose medical or emotional illness, mental deficiency, behavior or conduct disorder, severe physical disability, substance abuse, or chemical dependency makes the parent unable or unwilling to provide an adequate permanent home for the child at the present time or in the reasonably near future based upon expert opinion or based upon an established pattern of behavior.