672 So.2d 342 (1996)
STATE of Louisiana in the Interest of BJ and MJ.
No. CA 95 1915.
Court of Appeal of Louisiana, First Circuit.
April 4, 1996.
*344 Kathy Conn Alford, Bogalusa, for Appellant, DJ.
Ray Richardson, Bogalusa, for Appellant, RJ.
James H. Looney, Covington, for Appellees BJ and MJ.
Candice S. LeBlanc, Baton Rouge, for Appellee, State of Louisiana.
William H. Arata, Bogalusa, for TC.
Before LeBLANC, WHIPPLE and FOGG, JJ.
WHIPPLE, Judge.
The State of Louisiana, Department of Social Services (State), initiated proceedings to terminate the parental rights of DJ (the mother) and RJ (the father).[1] Both parents appeal the trial court's judgment terminating their parental rights. We affirm.

FACTS AND PROCEDURAL HISTORY
DJ is the natural mother and RJ is the legal father of the minor children BJ, a girl born on September 4, 1985 and MJ, a girl born on November 21, 1986.
On March 19, 1993, an instanter order was issued and the minor children, BJ and MJ, were placed in the custody of the State. Following a "72-hour hearing" on March 22, 1993, the minor children were adjudged "children in need of care," and custody was continued with the State. The record in this case shows that there were eight hearings relative to these children after the initial "72-hour hearing": an adjudication and disposition hearing held on May 11, 1993; a six-month review hearing held on August 10, 1993; a twelve-month review hearing held on April 12, 1994; a special review hearing held on June 14, 1994; an eighteen-month review hearing held on September 13, 1994; a special review hearing held on January 10, 1995; a twenty-four month review hearing held on March 14, 1995; and the termination proceedings held on August 9, 1995.
The record establishes the following facts. The family involved herein was well known to the State prior to the March 22, 1993 hearing when custody of the two children was awarded to the State. Mr. Leonard Oswald, Social Services Supervisor, testified that the State had been involved in parenting problems with this family even prior to BJ's birth, when the State discovered that DJ was pregnant. Oswald testified that the State had been working with the family extensively prior to the births of BJ and MJ and continuously thereafter.
Oswald detailed the problems of the family prior to custody being awarded to the State. According to Oswald, as part of its ongoing services, the State had assigned Laura Brown, as a "homemaker," for the family. Oswald testified that Brown had established a very close relationship with the family; *345 however, despite her very honorable efforts, the family situation had never truly improved over the years. He noted that Brown had constantly tried to help DJ maintain a clean and healthy household, and control the profuse lice infestation which was so out of control that school officials would not allow the children to attend school. She also had attempted to help the parties manage their family finances. He noted that the family was constantly moving despite the State's request that they maintain a stable home. Further, DJ and RJ had an extremely conflictual marriage and were constantly separating and reconciling. The parents were also having frequent and continuing problems with the authorities. He stated that DJ and RJ had exhibited deficient parenting skills and the children were exposed to verbal and physical abuse. Oswald noted that the parents exercised extremely poor judgment in virtually all aspects of their lives.
Oswald explained that the situation had gradually deteriorated over the years prior to the termination hearing despite the State's efforts to help the family and keep them together. In November of 1992, Brown died and according to Oswald, the family lost "the most significant and consistent positive support... they had ever experienced." Further, MJ entered school and the officials noticed extreme developmental delays and behavioral disorders.
In March of 1993, complaints involving the family were made to the State. Mr. Drew LeBlanc, a Child Protection Investigator for the Office of Community Services in Washington Parish, was the initial case investigator. LeBlanc received three complaints of abuse and neglect regarding BJ and MJ, namely: (1) sexual exploitation because DJ had allegedly made BJ take a nude photograph of DJ to send to TC, a man with whom she had previously had an extra-marital affair; (2) physical abuse because DJ had allegedly hit BJ in the face with a flyswatter; and (3) inadequate housing. Upon investigation, LeBlanc determined the allegations of sexual exploitation were valid, as DJ admitted that she had BJ take the photograph. Despite DJ's denial, LeBlanc also verified the allegation of physical abuse. BJ related to him that DJ had hit her in the face with a flyswatter and a neighbor also had seen the flyswatter imprints on BJ's face. LeBlanc further testified that while the condition of the home was deplorable, it nonetheless met minimum State standards. Thus, he was unable to validate the complaint of inadequate housing. However, LeBlanc testified that while speaking to DJ, there were roaches coming out of her shoes and that she was totally unaware of their presence. Further, LeBlanc testified that there were dishes left lying around with old food on them and that MJ was observed sitting on the floor playing with the dust in the air.
He also noted that DJ told him that an incident of sexual abuse of BJ by RJ had occurred. According to DJ, RJ had fondled BJ while they were all in bed together. RJ denied the allegation. When LeBlanc questioned BJ, she also denied that RJ had improperly fondled her, but did tell LeBlanc that TC had touched her "in her private area." BJ also recited very explicit details of DJ and TC's previous sexual encounters.
Following these incidents and the investigation by LeBlanc, the State sought and obtained an instanter order. Following a hearing, the children were adjudged in need of care. Custody was awarded to the State and the children were placed in foster care. Following this adjudication, Mary Webb took over the case.[2]
In September of 1993, Wanda Wagner was assigned as case manager for the family. Wagner testified that the parents' problems included a very conflictual marriage, instability, continuous problems with law enforcement, and inadequate housing. DJ reported, and BJ confirmed, that RJ drank alcohol excessively and was physically abusive towards DJ. Wagner explained that during her tenure as case manager, DJ had moved seven times and RJ had moved four times. Also in that time frame, the parents had been incarcerated a total of seven times. At *346 the time of trial, DJ was imprisoned in the Washington Parish Jail and RJ was in the Avoyelles Correctional Facility.
Wagner testified that the State adopted, as much as practical considering the frequent incarceration and moving by the parents, three case plans for the family. Wagner stated that she had also requested that the parents keep her informed of their whereabouts, which they failed or refused to do. Wagner also attempted to have DJ establish residence at a home for retarded citizens, but she vehemently refused. Wagner testified that the parents attended the family team conferences and visitation sessions when they were not incarcerated.
The parents' visitation sessions with the children were supervised and Wagner was often present at these sessions. Wagner testified that when visitation involved both parents, DJ was inactive in the sessions with the children and the children did not interact with DJ without direction. Further, Wagner stated that when there was interaction between DJ and the children, her behavior was more akin to that of a peer than a parent. She often noted that during these sessions, DJ had to be scolded for misbehaving, along with the children.
Pam Miley, the children's Court Appointed Special Advocate, also attended some of the visitation sessions and testified that DJ displayed inappropriate behavior at the sessions, including discussing with the children her incarceration and the court hearings involving the children, despite continuous requests that she not involve the children in these discussions. Regarding RJ, Miley testified that he seemed to enjoy the visits with the children when he was not incarcerated, but was often unable to comprehend or participate in BJ's discussions, especially when they regarded her activities at school.
After prolonged attempts to reunify the family failed, the State's goal of reunification was eventually changed to a goal of termination of parental rights to free the children for eventual adoption. On May 3, 1995, the State filed a petition for termination of parental rights[3], pursuant to Louisiana Children's Code article 1015, sections (4), (5) and (7).[4] A hearing on the petition was conducted on August 9, 1995. Following the hearing, the trial court rendered judgment terminating the parental rights of both parents and freeing the children for adoption.
From this judgment, both parents have appealed. DJ asserts that the trial court erred in terminating her parental rights because the State failed to prove that termination was proper. RJ contends that the trial court erred in terminating his parental rights because there was no evidence presented by the State that: (1) RJ was involved in the physical abuse or the sexual abuse which resulted in State custody; (2) he was an unfit parent; or (3) he had not taken any steps toward rehabilitation.

LEGAL PRECEPTS
The State's petition for termination of parental rights was filed pursuant to LSA-Ch.C. *347 art. 1015(4), (5) and (7).[5] LSA-Ch.C. art. 1015 provides several subsections containing the requirements for termination of parental rights. In oral reasons for judgment, the trial court indicated that the State had proven the elements of subsection (5).[6]
The State need only prove the grounds for termination under one subsection. State in the Interest of WS, JS and HS, 626 So.2d 408, 413 (La.App. 1st Cir. 1993). LSA-Ch.C. art. 1015 addresses the grounds for involuntary termination of parental rights and provides, in pertinent part, as follows:
The grounds set forth in the petition must meet all of the conditions of any one of the following Paragraphs:
* * * * * *
(5) Prior adjudication as a child in need of care and removal from the parental home
(a) One year has elapsed since a child was removed from the parent's custody pursuant to a court order in a child in need of care proceeding and placed either in the custody of an agency or individual.[7]
(b) The parent is now unfit to retain parental control, and there is no reasonable expectation of his reformation in the foreseeable future.
(c) The department has made every reasonable effort to reunite the child with his parents to no avail but now recommends that reunification would not be in the best interests of the child.
LSA-Ch.C. art. 1003(10) defines "unfit" as referring to a parent who has exhibited any one of the following behaviors or conditions:
(a) Who has abused a child by inflicting physical or mental injury which causes severe deterioration of the child, or who has sexually abused, exploited, or overworked a child to such an extent that his or her health or moral or emotional well-being is endangered.
(b) Who has consistently refused to provide reasonably necessary food, clothing, appropriate shelter, or treatment either by medical care or other health services in accordance with the tenets of a well-recognized religious method of healing with a reasonable proven record of success. Financial inability alone shall not constitute grounds for termination of parental rights.
(c) Whose medical or emotional illness, mental deficiency, behavior or conduct disorder, severe physical disability, substance abuse, or chemical dependency makes the parent unable or unwilling to provide an adequate permanent home for the child at the present time or in the reasonably near future based upon expert opinion or based upon an established pattern of behavior.
According to the jurisprudence, "reformation" of a parent, for purposes of determining whether parental rights should be terminated, means more than mere cooperation with agency authorities. A showing of a significant, substantial indication of reformation is required, such as altering or modifying in a significant way the behavior which served as a basis for the State's removal of the child from the home. State in the Interest of EG, 95-0018, p. 5 (La.App. 1st Cir. 6/23/95), 657 So.2d 1094, 1097, writ denied, 95-1865 (La. 9/1/95); 658 So.2d 1263.
*348 LSA-Ch.C. art. 1035 dictates that the elements of subsection (5) of article 1015 be proven by clear and convincing evidence. To prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable, that is, much more probable than its nonexistence. Hines v. Williams, 567 So.2d 1139 (La.App. 2nd Cir.), writ denied, 571 So.2d 653 (La.1990). See also State in the Interest of J, K AND T, 582 So.2d 269, 275 (La.App. 1st Cir.) (Lanier, J., concurring), writ denied, 583 So.2d 1145 (La.1991). The evidentiary standard established in termination cases mandates that the State present proof by clear and convincing evidence of the parent's failure to comply with all of the enumerated conditions specified in any one or more of the paragraphs set forth in Article 1015 as the basis for termination of parental rights under the circumstances. State in the Interest of EG, 95-0018 at p. 3; 657 So.2d at 1096. Also, the factual findings of the trial court in determining whether the requirements of article 1015 have been satisfied will not be set aside in the absence of manifest error. State in the Interest of WS, 626 So.2d at 413-414.

DISCUSSION
Both parents contend that the trial court erred in terminating their parental rights to the children. However, after applying the above legal precepts to this case, we cannot conclude that the trial court was manifestly erroneous in finding that the State proved by clear and convincing evidence that termination was proper.
LSA-Ch.C. art. 1015(5)(b) requires that the State prove that the parent is unfit to retain parental control, and that there is no reasonable expectation of reformation in the foreseeable future.

Lack of Parental Fitness Due to Past Abuse and Deterioration of the Children

DJ's Parental Influence
Here, we find overwhelming evidence in the record to support the trial court's conclusion that DJ was an unfit parent. The documentary evidence and the testimony elicited in these proceedings illustrate the severe deterioration of the physical and mental condition of the children as a result of parental neglect and abuse, endangering their health, moral and emotional well-being.
The deleterious effect of the parental influence of the parties was noticed by school officials as soon as MJ entered the school system. Oswald testified that school officials immediately saw evidence of developmental delay, lack of basic personal hygiene, and behavioral disorders. School officials immediately noticed signs that the children were suffering directly as a result of the lack of care by the parents and the living conditions and unstable lifestyle which they endured. The children were constantly infested with lice, resulting in excessive school mandated absences from school.
Ms. Elaine Spencer-Carver, accepted by the court as an expert clinical social worker, testified concerning the condition of the children. Spencer-Carver testified that MJ has a pervasive developmental disorder, similar to autism, and tremendous speech delays. She noted that at the time of trial, although MJ was almost nine years old, she was not toilet trained. According to Spencer-Carver, MJ is a child who requires constant supervision and control which she had not received from her parents.
Regarding BJ, Spencer-Carver testified that she is physically and verbally aggressive and has developmental delays. BJ was described as a child who has the ability to exercise good judgment and actually demonstrates better judgment than her parents. As a result, BJ had been forced to take on parental-type responsibility for herself and MJ at a very early age. Both children exhibit difficulties in relationships with other people. Spencer-Carver testified that both of the children are making significant progress and both have the potential to continue this progression if placed or maintained in a healthy environment. However, she opined that if returned to their previous environment, the children would in all likelihood regress to their former states. Finally, Spencer-Carver opined that the children's special needs resulted from a lack of care and nurturing.
*349 The record further supports the finding that BJ had been sexually exploited in the past by her mother. After she refused to return home from visitation with an aunt, BJ eventually told authorities how she had been involved in the taking of a nude photograph of DJ, at her mother's direction and insistence. Further, at approximately eight years of age, BJ was able to recite detailed and explicit information concerning sexual encounters and liaisons her mother had engaged in with TC.
Based on this evidence, we find that the record amply supports the finding that DJ is an unfit parent as defined by LSA-Ch.C. art. 1003(10)(a).

RJ's Parental Influence
Likewise, regarding RJ, the evidence establishes that he is also an unfit parent. The record clearly shows the children were subjected to circumstances causing severe deterioration to them and endangering their health and their moral and emotional well-being. The record clearly supports a finding that the abuse and neglect of these children by both parents over the years resulted in the deterioration of the emotional and physical condition of the children. While we disagree with RJ's statement that the record does not show the requisite level of proof he was directly involved in the sexual exploitation and physical abuse of BJ, we nonetheless find that the record supports the court's finding of unfitness as to RJ as defined in LSA-C.Ch. art. 1003(10)(a).

Lack of Parental Fitness Due to the Parties' Mental Deficiencies and Inability to Provide an Adequate Permanent Home
The record also supports a finding that both parents are unfit as defined by section (10)(c) of article 1003. Dr. Brian Murphy and Dr. Valerie Turgeon, both accepted by the court as experts in psychology, testified on behalf of the State. Dr. Murphy evaluated DJ on March 21, 1995. He concluded that DJ's mental age was approximately ten to twelve years old, that her achievement level was that of first grade or below and that DJ suffers mild to moderate mental retardation. Moreover, Dr. Murphy found that DJ was severely depressed with psychotic symptoms, and was suffering from inadequate personality disorder syndrome and borderline personality disorder. Dr. Murphy explained that a person with these disorders typically exhibits lack of confidence, self-esteem and inertia, engages in reckless behavior, and is only capable of superficial relationships. He described DJ's disorder as involving impulsively hedonistic behavior and noted that she continued to exhibit a total lack of insight into why her children had been removed from her care, feeling that the State had over-reacted and had no justifiable cause to remove her children. Dr. Murphy opined that DJ was unfit and incompetent as a parent due to her cumulative problems. Dr. Turgeon opined that DJ has a mental age of only five years, ten months, and suffers from moderate mental retardation.
As to RJ, the record reflects that he is also unable or unwilling to provide an adequate permanent home for the children due to his mental deficiencies. This finding is supported by both expert testimony and his past pattern of behavior.
Dr. Turgeon testified that RJ has a mental age of seven years, six months and functions in the range of moderate mental retardation. According to Dr. Turgeon, this level of functioning places RJ in "at least the lowest percentile with regard to peers." Moreover, Dr. Turgeon explained that this level of functioning results in RJ being unable to exercise good judgment.
RJ argues that there is no expert testimony establishing his inability to exercise good judgment. However, the record is replete with instances of past conduct establishing his inability to do so, including his constant involvement with the authorities; his abuse of alcohol; his physical abuse of DJ, which was observed and verified by BJ; and his willingness to allow the family to live in a deplorable state.
Dr. Turgeon also testified that RJ's limited cognitive ability detrimentally affects his ability to adequately parent his children or to learn how to adequately parent them. Moreover, she noted that RJ's level of functioning results in his inability to properly supervise *350 the children, especially in light of their special needs, and his inability to have insight into the problems facing the children.
The record also reflects that RJ has established a pattern of behavior which indicates that he is unwilling or unable to provide an adequate permanent home for the children. Despite the State's continuous request that RJ establish a permanent residence, RJ was constantly moving and neglecting to inform the State of his whereabouts. Further, much of his time was spent in prison.

Lack of Reasonable Expectation of Reformation by the Parties
Regarding the requirement that the State prove that there is no likely expectation of reformation, Dr. Murphy testified that other than treatment for depression, there is no treatment to remedy DJ's retardation or personality disorders. Dr. Murphy opined that she has no capacity to parent the children, now or in the future. Thus, he recommended termination of her parental rights. Likewise, Dr. Turgeon opined that there is no available treatment to improve DJ's level of functioning and inability to use good judgment because of her limited cognitive abilities. Because Dr. Turgeon was unable to see any possibility for change on DJ's part, she likewise recommended termination of DJ's parental rights.
Regarding RJ, Dr. Turgeon stated that she saw no possibility of any improvement in his level of functioning, due to his limited cognitive abilities. She noted that RJ would also be unable to improve or correct his inadequate parenting skills and deficiencies. Thus, she recommended termination of his parental rights as well.
RJ contends on appeal that he has taken steps towards rehabilitation or reformation and that accordingly, the finding that he is unfit is not supported by the record. We disagree.
We have carefully reviewed the record herein and find that RJ has not shown a significant, substantial indication of reformation by altering or modifying in a significant way the behavior which served as a basis for the State's removal of the children. For example, between the time that the instanter order was issued and the date of the termination proceedings, RJ was incarcerated at least four times, for criminal activities and writing worthless checks. At the time of the termination hearing, he was incarcerated at the Avoyelles Correctional Facility. Wagner testified that the State could not see any indication of reformation, despite his very recent attendance at Alcoholics Anonymous and mental health counseling. After careful review, we find that the record supports the trial court's conclusion that RJ had not shown a significant, substantial indication of reformation in the course of the State's involvement with these children.

Failed Efforts by the State to Reunite the Family
Finally, pursuant to LSA-Ch.C. art. 1015(5)(c), the State was required to prove that the department had made every reasonable effort to reunite the children with the parents to no avail, and that reunification would not be in the best interests of the children.
Oswald testified that the State offered the parents every available service, with little or no benefit, due to the parents' mental and emotional limitations and behavior. Much of the time, the State was unable to locate the parents or they were unable to participate due to incarceration for various offenses, including writing bad checks and forgery. Thus, the parenting classes which were offered by the State were only sporadically attended by the parties. The visitation sessions were likewise curtailed by the parents' imprisonment at various times. Oswald stated that the case workers were never able to present a positive report and that the parenting classes accomplished only limited results, even when the parents were present. Wagner, the case manager, testified that termination of parental rights was recommended. Miley, the children's CASA, also stated that the family has been constantly deteriorating and concurred in the State's recommendation.
After a careful review of record herein and in light of the above outlined *351 testimony, and the additional reports and evidence in the record, we are unable to find that the trial court was manifestly erroneous in its factual findings and conclusion that the State proved, by clear and convincing evidence, elements of LSA-Ch.C. art. 1015(5), warranting the termination of parental rights.
These assignments of error are without merit.

CONCLUSION
For the above and foregoing reasons, we find no merit in the assignments of error specified by appellants herein. Accordingly, the judgment of the trial court terminating the parental rights of DJ and RJ and freeing the children for adoption is hereby affirmed at appellants' costs.
AFFIRMED.
NOTES
[1] This court has edited the case caption and the names of the parties and the children to protect the confidentiality of this juvenile proceeding. LSA-Ch.C. art. 1007. See also LSA-Ch.C. art. 412.
[2] Mary Webb did not testify, as she had moved to New York and was no longer employed by the State.
[3] During the course of the State's involvement with this family, DJ made allegations that BJ's biological father was TC. In the petition to terminate parental rights, the State sought to terminate TC's parental rights with regard to BJ, pursuant to LSA-Ch.C. art. 1015(8) & (9). An attorney was appointed to represent TC in these proceedings and the attorney appeared on TC's behalf at the termination hearing. Following the hearing, judgment was also rendered against TC. The portion of the judgment terminating TC's parental rights has not been appealed and is now final.
[4] The record does not contain an answer filed on behalf of RJ. Generally, no valid judgment may be rendered against a party with whom issue has not been joined by way of answer, default or waiver. Northshore Insurance Agency, Inc. v. Farris, 634 So.2d 867, 869 (La.App. 1st Cir. 1993). However, by order dated May 9, 1995, the court appointed attorneys to represent all parties. Both RJ and his court-appointed attorney were present at the termination hearing and participated therein. Moreover, by order dated August 23, 1995, the court appointed an attorney to represent RJ on appeal. A motion for appeal was filed on RJ's behalf by his court-appointed attorney, and an order granting RJ a suspensive appeal was obtained. An appellate brief has been filed in this court. Thus, we find that issue was joined as to RJ by his waiver of this irregularity, and the judgment on the merits rendered against RJ is valid.
[5] These provisions of the Children's Code became effective January 1, 1992 and are substantially similar to the provisions formerly contained in LSA-R.S. 13:1601. Thus, we adhere to jurisprudence interpreting the former legislation when necessary. State in the Interest of WS, JS and HS, 626 So.2d 408, 413 (La.App. 1st Cir. 1993).
[6] The trial court also stated that, in its opinion, the State had proven the elements of subsection (7) as well.
[7] The record clearly establishes that the first requirement of LSA-Ch.C. art. 1015(5) has been satisfied, and indeed, neither parents contest this finding. The children were removed from their parents' custody pursuant to an instanter order dated March 19, 1993. On March 22, 1993, the children were adjudicated in need of care and legal custody was awarded to the State. The petition for termination of parental rights was filed on May 3, 1995. Consequently, more than one year had elapsed between the date of removal of the children from their parents' custody pursuant to a court order in a child in need of care proceeding and the date of filing of the petition herein.