1»GUIDRY, J.
This is an appeal by M.P.J.J.B., the mother, from a judgment terminating her parental rights and certifying the three minor children, B.J., J.N.J. and J.M.J., for adoption. The three alleged fathers have not appealed the termination of their parental rights. For the reasons that follow, we reverse the portion of the trial court’s judgment from which M.P.J.J.B. appeals and render.
FACTS AND PROCEDURAL HISTORY
B.J., (born on October 7, 1991), J.N.J., (born on February 4, 1993), and J.M.J., (born on July 26, 1994) entered state custody on September 20, 1996, after a complaint of lack of supervision. According to initial reports of the Office of Community Services (OCS), the mother, M.P.J.J.B., left the children at night with a sitter without telling when she would return and, sometimes, she would be gone for days. According to OCS case plans in the record and testimony from the mother, OCS was already involved with the family when M.P.J.J.B. requested that her children be taken into foster care because she was having a nervous breakdown and was unable to care for them. She also had limited family resources so placing her three daughters with a family member was not a viable option.
The trial court held a seventy-two hour hearing and ordered that the children remain in state custody pending an adjudication hearing on November 12, 1996, at which it was determined that the children were in need of care and would remain in state custody for the next six months. The court ordered M.P.J.J.B. and C.J., her husband at that time, to continue mental health treatment and counseling, and to provide regular schooling with a special-education emphasis for the children.
OCS formulated case plans on January 28 and August 20, 1998; February 1 and August 4, 1999; and February 2, 2000, for M.P.J.J.B. related to accomplishing |3a permanency plan for the children. Although each case plan stated that adoption is the permanent plan for the family, the initial case plans contained the following goals: establish a stable residence; continue to receive psychiatric treatment through the local mental health clinic; continue to improve her parenting and coping skills; maintain a relationship by visitation with her children; adhere to the requirements and conditions of her probation for forgery and burglary; make herself available for a home study if she moved to Texas; and that her boyfriend, J.B., whom she married in September 1998, cooperate with Social Services in Texas in furnishing personal information for a background check.
After the September 16, 1998 review hearing, the requirements remained the same except visitation was changed from once a week to once per month because of the mother’s stay in Texas. After the March 9 and September 14, 1999 review hearings, the requirements remained the same except that visitation between the children and the mother was suspended upon the recommendation of Dr. Timothy Brown, the psychiatrist who evaluated M.P.J.J.B. for one hour in February 1999, and who evaluated the children on several occasions.
In August 1999, M.P.J.J.B.’s case plan goals were changed as follows: establish a stable residence; maintain good mental health; continue to abide by the requirements and conditions of her probation; have her husband make himself available to the agency; the agency to provide therapy for M.P.J.J.B. (regarding dealing with the loss of her children); and the agency filing a petition for termination of parental rights.
On September 20, 1999, the state filed a petition for termination of parental rights and certification of the three minor children for adoption under LSA-Ch.C. art. 1015(4) and (5). After a hearing held on March 30 and April 11, 2000, the | ¿trial *872 court signed a judgment terminating the parental rights of M.P.J.J.B. under La. Ch. C. art. 1015(5) and the three alleged fathers under La. Ch. C. art. 1015(4) and certifying the children as eligible for adoption on May 19, 2000. Only M.P.J.J.B. has appealed, asserting that the state failed to show that she did not substantially comply with her case plan and that there is no reasonable expectation of significant improvement in her condition or conduct in the near future.
DISCUSSION

Standard of Review

A court of appeal may not overturn a judgment of a trial court absent an error of law or a factual finding which is manifestly erroneous or clearly wrong. Before an appellate court may reverse a factfinder’s determinations, it must find from the record that a reasonable factual basis does not exist for the findings and that the record establishes that the findings are clearly wrong (manifestly erroneous). State, In Interest of GA, 94-2227, p. 4 (La.App. 1st Cir. 7/27/95), 664 So.2d 106, 110. The factual findings of the trial court in determining whether the requirements of article 1015 have been satisfied will not be set aside in the absence of manifest error. State in Interest of BJ, 95-1915, p. 9 (La.App. 1st Cir.4/4/96), 672 So.2d 342, 348. Specifically, whether the mother has shown no significant substantial indication of reformation, and whether she is unlikely to reform are questions of fact. State, In Interest of GA, 94-2227 at 4, 664 So.2d at 110.

Termination of Parental Rights

Parental rights to the care, custody, and management of children are a fundamental liberty interest warranting great deference and vigilant protection under the law. State, in Interest of GA, 94-2227 at 5, 664 So.2d at 110. The termination of parental rights is a severe and irreversible action. State in the interest of L.L.Z. v. M.Y.S., 620 So.2d 1309, 1313 (La.1993). Thus, the legislature has imposed strict procedural and evidentiary requirements which must be met before issuance of a judgment terminating parental rights. State in Interest of GA, 94-2227 at 5, 664 So.2d at 110.
La. Ch. C. art. 1035 dictates that the elements of subsection (5) of article 1015 be proven by clear and convincing evidence. To prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable, that is, much more probable than its nonexistence. State in Interest of BJ, 95-1915 at 9, 672 So.2d at 348. The evidentiary standard established in termination cases mandates that the state present proof by clear and convincing evidence of the parents’ failure to comply with all of the enumerated conditions specified in any given subsection of La. Ch. C. art. 1015 which permits termination of parental rights under certain circumstances. State in Interest of EG, 95-0018, p. 3 (La.App. 1st Cir. 6/23/95), 657 So.2d 1094, 1096. The “clear and convincing evidence” burden of proof is an intermediate one between the burden of proof by a preponderance of the evidence and the burden of proof beyond a reasonable doubt. Proof by clear and convincing evidence requires more than a “preponderance” of the evidence, the traditional measure of persuasion, but less than “beyond a reasonable doubt,” the stringent criminal standard. In the Interest of CLS, 94-531, pp. 5-6 (La.App. 3rd Cir. 11/2/94), 649 So.2d 532, 536.
The ground for involuntary termination of parental rights applicable in this case is La. Ch. C. Art. 1015(5), which provides:
Unless sooner permitted by the court, at least one year has elapsed since' a child was removed from the parent’s custody pursuant to a court order; there has been no substantial parental compliance with a case plan which has been previously filed by the department and approved by the court as necessary for *873 the safe return of the child; and despite earlier intervention, there is no reasonable expectation of | ^significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home.
According to La. Ch. C. art. 1036 C, lack of parental compliance with a case plan under article 1015(5) may be evidenced by one or more of the following:
(1) The parent’s failure to attend court-approved scheduled visitations with the child.
(2) The parent’s failure to communicate with the child.
[[Image here]]
(5) The parent’s repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
(6) The parent’s lack of substantial improvement in redressing the problems preventing reunification.
(7) The persistence of conditions that led to removal or similar potentially harmful conditions.
La. Ch. C. art. 1036 D further provides that, under article 1015(5), the lack of any reasonable expectation of significant improvement in the parent’s conduct in the near future may be evidenced by one or more of the following:
(1) Any physical or mental illness, mental deficiency, substance abuse or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based on expert opinion or based upon an established pattern of behavior.
[[Image here]]
(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.
[7When the court finds that the grounds set out in any paragraph of article 1015 are proven true by the evidentiary standards required by article 1035 and that it is in the best interest of the child, it must order termination of parental rights. La. Ch. C. art. 1037 A.
In support of its termination petition, the state offered the testimony of Dale Lott and Buddy McElveen, OCS case workers; Ann Thames, a licensed social worker, and Laura Lawson, OCS investigator, both of whom provided parenting classes; Dr. Timothy Brown, child and adolescent psychiatrist; Judy Laurendine, the children’s therapist; Kathy Warner, social worker and records custodian at Bo-galusa Mental Health Clinic; Madge Byrd, Court Appointed Special Advocate (CASA) volunteer; and the foster mother.
Dale Lott, OCS case manager, testified that M.P.J.J.B. did not substantially comply with the case plan: she did not continue psychiatric treatment at the mental health clinic, she was never able to demonstrate the ability to discipline her children during visitation, and while she was in Texas, she did not maintain contact with her children for a six-month period from March 20 until September 25, 1998. Although M.P.J.J.B. and J.B., her current husband, testified to the contrary, Lott stated that J.B. never provided any information requested to do a background check.
On cross-examination, Lott testified that M.P.J.J.B.’s case plan required her to monitor her own behavior to determine if she needed mental health treatment and that OCS “encouraged her to go.” He further testified that M.P.J.J.B. made all of her visits with her children during October, November, and December 1998. These visits occurred after M.P.J.J.B. married J.B. on September 1, 1998, and they began to live as a couple in Louisiana. The January visit was canceled because one |sof the children was ill, and M.P.J.J.B.’s visitation rights were termi *874 nated in February 1999. According to Lott, M.P.J.J.B. and J.B. attended the family team conferences and she completed the terms of her probation. He stated that she would bring things to his office to give to the children on their birthdays except when she was in Texas.
Lott further testified that M.P.J.J.B. has continually stated that she wants her children returned to her and has said that now that she has married, she has someone to help her with her children. She stated to him that she believes she can take care of their needs. Lott testified that she did attend some, although not all, of the parenting classes. According to Ann Thames, social worker, M.P.J.J..B. attended four of six parenting classes from January 22 through March 15, 1997, and five of five classes in 1998. Laura Lawson, OCS investigator, further testified that M.P.J.J.B attended three of six parenting classes held from April 15 through May 20, 1999. M.P.J.J.B. testified that she and her husband missed some of the later parenting classes because of lack of transportation and her husband’s job required working at night. In addition, the 1999 case plan no longer specified parenting classes as a requirement.
Dr. Timothy Brown, a psychiatrist, testified that he evaluated M.P.J.J.B. during a one hour visit on February 24, 1999, and that she reported to him that she contacted OCS to take care of her children because of her psychiatric difficulties. He stated she told him she had been previously hospitalized because of her mental health. Dr. Brown testified that, based on records that he had received from OCS and his evaluation of her, he opined that she had a mood disorder, rendering her incapable of controlling her emotional state. According to Dr. Brown, she was previously diagnosed with Schizo-Affeetive Disorder, a combination of | ^schizophrenia and bipolar disorder. However, there are no mental health records in evidence to support this alleged previous diagnosis, which M.PJ.J.B challenges on appeal as unfounded and erroneous. Although there is a notation in the record for State Exhibit 6 that copies of the local mental health clinic records in lieu of the originals were to be substituted, the copies were never received by the trial court and the originals are not included in the record on appeal.
Dr. Brown also evaluated the three children. He initially met with B.J., the oldest, on December 2, 1998, and last saw her on June 4, 1999, diagnosing her as having post-traumatic stress disorder, anxiety disorder, and parent-child relationship problems. She related to him that she had been subjected to sexually inappropriate behavior while living with her mother. According to Dr. Brown, she displayed excessive worry and had difficulty focusing, which was caused by chaos in her early life because of “many moves and many people in and out of her life.” J.N.J., the middle daughter, was also diagnosed with post-traumatic stress disorder and parent-child relationship problems as well as attention deficit/hyperactivity disorder (ADHD), and she tested as mildly mentally retarded. She also related that she had been exposed to sexually inappropriate behavior. J.M.J., the youngest daughter, was diagnosed with ADHD, possible oppositional defiant disorder, and parent-child relationship problems. According to Dr. Brown, J.M.J. is “very physically hyperactive” and physically aggressive as a result of inconsistent discipline. He concluded that it would be difficult for M.P.J.J. .B. to raise these “three very difficult children,” with two of them having ADHD and one child who is acting out sexually.
Judy Laurendine, the children’s therapist, stated that, although the two younger children did not appear to remember their mother well, she felt that it is in 11flthe best interest of the oldest child, B.J., to have future supervised, controlled visits with M.P.J.J.B. Although she recommended termination of parental rights for all three children, she testified that B.J. told her *875 that she missed her mother and wanted to see her. Buddy McElveen, OCS case worker, also testified that B.J. told him the same statement. Ms. Laurendine further recommended that visits should remain supervised if M.P.J.J.B.’s rights are not terminated.
Although there are no mental health documents in the record, Kathy Warner, social worker and records custodian at Bo-galusa Mental Health Clinic, testified that M.P.J.J.B.’s case was closed in March of 1996, and she was readmitted to the clinic in October of 1996, because of hospitalization for mental illness. In June 1998, the case was again closed because M.P.J.J.B. stated that she had moved. Ms. Warner testified that there were no records from June 10, 1998, until March 23, 2000, when M.P.J.J.B. reapplied for services and was placed on antidepressant medication. Ms. Warner stated that the case was closed because M.P.J.J.B. had not been to the clinic in six months, and the clinic’s policy was to close a case under those circumstances. According to Ms. Warner, M.P.J.J.B. was never discharged. Although the CASA report is not in the record, Madge Byrd, CASA volunteer, testified that M.P.J.J.B. told her that she thought that the mental health clinic had discharged her. When Ms. Byrd called the clinic, she was informed that M.P.J.J.B; was no longer being treated as a patient. The reason for the lack of treatment was unclear to Ms. Byrd.
M.P.J.J.B testified on her own behalf that she called OCS to place the children in foster care until she was more stable and that she never intended to permanently abandon her children. She stated that she felt like she was having a nervous breakdown and that during her first marriage “[m]y husband (C.J.) had put lume through a lot, he just.. .broke into my house and .. .1 was frightened.. .1 didn’t have my family, I didn’t have much... and I don’t have very much help.” She called OCS to help her and to “place my kids into foster care until I could get back on my feet again to be able to take care of them.” She testified that at that time she was having financial problems, living on her S .S.I. benefits which were less than $500 per month when she was rearing the three children. She stated that she never left her children with anyone except family prior to her call to OCS for help. She testified that she visited her boyfriend, J.B., in Texas, never actually moved there, and that she informed OCS of her whereabouts.
As of the date of the termination hearing, M.P.J.J.B. and J.B. had been married for approximately eighteen months and had lived in the same house for more than one year. She testified that her mental health was much better than when she was with her first husband and that marriage with her current husband has had a positive effect on her. She stated that she had negative feedback in her life in the past which led to depression but J.B. acts positively with her and is a good husband, who holds a steady night job. She stated that she has not been depressed in a long time although she has been anxious about the termination hearing and the possibility of losing her children. M.P.J.J.B. admitted that she missed some mental health appointments and stopped taking her medication several times because she believed that she did not need it. Although she had attended most of the parenting classes in the earlier two sessions, she explained that she did not finish the third session of parenting classes because of lack of transportation and her husband’s evening job. She stated that if any sexual abuse had occurred to her children prior to this marriage that she was unaware of it at the time that it happened.
haHer husband, J.B., and two neighbors testified that M.P.J.J.B’s mental health had improved and that they had seen a difference in her in that she cooks regularly, and the home and yard are clean and well kept. The neighbors testified that M.P.J.J.B. had a “rough time” when she was married previously to C.J. and that *876 she was very nervous, upset, and depressed during that marriage. They both testified that she has a positive relationship with her current husband and that she does not use alcohol or drugs.
The trial court in its reasons for judgment found that the case plans consistently provided that M.P.J.J.B. was to seek ■regular treatment from the local mental health clinic and that she failed to do so. The court also found that she did not follow the case plan requirement of regular visitation with her children, citing the period of almost six months when she was going to Texas. In the trial court’s opinion, the most important part of Dr. Brown’s testimony was that he believed that there was no reasonable expectation of improvement in her mental condition. Accordingly, the trial court found that the state met its burden of proof in terminating the parental rights of M.P.J.J.B. under La. Ch. C. art. 10l5(5).
We, however, conclude that the record does not support a finding that the state met its burden of proving by clear and convincing evidence that there has been no substantial compliance with the case plan concerning mental health treatment and visitation, and that there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future under La. Ch. C. articles 1015(5), 1035, and 1036 C and D. The state’s sole medical witness, Dr. Brown, only met with M.P.J.J.B once for one hour and he testified that he relied upon a previous diagnosis of Schizo-Affective Disorder. He did not testify about the source of that information nor does the record show when or by whom the | ^diagnosis was made. In particular, there is no proof by medical documentation in the record as to whether that diagnosis was made during her hospitalization, at the mental health center, or by another doctor utilized by OCS. In addition, on the date of the hearing, over a year had passed since Dr. Brown’s one-hour evaluation of M.P.J.J.B.. Thus, he was in no position to provide reliable testimony as to whether her conduct and/or condition had already significantly improved or whether any significant improvement in her conduct and/or condition could be reasonably expected in the near future.
Also, Ms. Warner, social worker and records custodian at the local mental health center, testified as to dates of M.P.J.J.B.’s treatment but there are no copies in the record of any of the original mental health records even though Ms. Warner testified that the clinic treated M.P.J.J.B. at intervals during a four-year time period. Also, the CASA report is not in the record. The only state exhibits in the record are the children’s birth certificates, parenting class attendance reports, and the case plans.
We note that the testimony of Dale Lott, OCS case worker, that M.P.J.J.B was allowed to monitor her own mental health behavior and to have treatment when she felt she needed it is inconsistent with the wording of the case plans concerning mental health treatment. Apparently, M.P.J.J.B. was told by her case worker that the decision was hers as to whether she needed treatment. Accordingly, we do not feel that her parental rights can be terminated because of lack of monthly attendance at the mental health clinic. She testified that she took medication when she felt that she needed it. There is no mental health documentation other than the one short visit to Dr. Brown and the testimony, rather than the records, of the clinic’s records custodian to show that M.P.J.J.B. had a |uchronic illness, as claimed by the state as a basis for termination, rather than situational depression caused by being in a bad first marriage and the possible termination of her parental rights, as claimed by M.P.J.J.B.
Furthermore, the state has not shown by clear and convincing evidence the second element required by La. Ch. C. art. 1015(5), that there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near *877 future, considering the child’s age and his need for a safe, stable, and permanent home. On the contrary, the testimony of M.P.J.J.B., her husband, and her two neighbors support the fact that M.P.J.J.B. has improved her condition and conduct since she married J.B. on September 1, 1998. Her testimony and that of the OCS case workers show that she intended to have her children returned to her. Since she remarried, she has visited her children as required until her visitation rights were terminated after the one visit she had with Dr. Brown, and she and her husband have attended family team conferences. They were in a relationship for one year before they were married, they have been married for more than eighteen months and have been residing at the same residence for more than one year, they have income from his job and her S.S.I. benefits, and she appears to be handling her homemaking responsibilities.
Although we reverse the termination of M.P.J.J.B.’s parental rights and the certification of the three minor children for adoption, the record reflects that reunification is not the best option at this time. The best interests of the three minor children, B.J., J.N.J., and J.M.J., are served by remaining in foster care with OCS services and controlled, supervised visitation with their mother, M.P.J.J.B, until such time as reunification is a viable option or until legally supportable termination proceedings are initiated, if the circumstances so warrant.
| ^CONCLUSION
For the foregoing reasons, that portion of the trial court’s judgment terminating the parental rights of M.P.J.J.B. to the minor children, B.J., J.N.J., and J.M.J., and certifying them for adoption is reversed. The three minor children are to remain in foster care with OCS services and controlled, supervised visitation with their mother, M.P.J.J.B. The state is cast for all costs of this appeal.
REVERSED IN PART AND RENDERED.
WHIPPLE, J., concurs for reasons assigned.